Argued March 13, 1928.
This is an appeal from a modification of an order of a judge sitting as a judge of the Juvenile Division of the Municipal Court, in the matter of Fred Stees, an alleged delinquent minor.
This matter first came before the court on a petition filed by the grandmother of the said Fred Stees, *Page 233 
Maude D. Stees, charging him with being incorrigible. A hearing on the said petition was had before one of the judges of the court, sitting as a Juvenile Court judge, on April 9, 1926, and the child was then placed on probation.
On May 10, 1926, the matter was again before the court, and, after hearing, it was continued until May 17, 1926, when he was committed to the Children's Aid Society, and an order in the sum of $3.50 a week for his support was made upon the grandfather, and in the sum of $1 per week upon the grandmother. Subsequently, Mr. Lee Solomon, probation officer, acting for the chief probation officer of this court, moved that the decree theretofore made be amended and the matter listed for a re-hearing.
On December 20, 1927, a re-hearing was had in the said matter; there being present in court Marie Schofield, the mother of the minor; Louis Stees, the paternal grandfather; and Maude Stees, the paternal grandmother. After hearing the testimony, the case was continued until December 22, 1927, for the purpose of bringing the said minor in court, and for the further purpose of having any other relatives who might be interested, present. At the hearing held on December 22nd, there were present Marie Schofield, the mother; Louis Stees, the paternal grandfather; W. Richardson Schofield, the step-father; Fred Stees, the minor; and Ralph S. Croskey, Esq., counsel for Mrs. Schofield, mother of the minor. The paternal grandmother was not present at this hearing, by reason of illness, and the court, after conferring with her over the telephone, continued the case until January 5, 1928, and sent the minor to his grandmother, who agreed to care for him over the Christmas holidays.
A continued hearing was held on January 4, 1928; there being present Marie Schofield, the mother; W. Richardson Schofield, the step-father; Maude Stees, the paternal grandmother; Mrs. Borton, a representative *Page 234 
of the Children's Aid Society; Dorothy Gabriel, Lancaster representative of the Children's Aid Society; and Ralph S. Croskey, Esq., counsel for the Schofields. After a rather lengthy hearing in the matter, the court modified the order theretofore made by making an order of $2.50 per week upon the paternal grandfather, $1 per week upon the paternal grandmother, and $2.50 per week upon the mother, and continued the matter for final disposition until June of 1928.
To properly understand the matter, it is important to have the history of the case in mind. It appears from the testimony produced at the various hearings that the minor, who is now nearly thirteen years of age, was born six months after his father died, and that shortly after his father's death his mother remarried. For some reason probably better known to the mother herself than was disclosed by her at the hearing, the minor was turned over to the paternal grandparents. He was with his paternal grandparents until they were divorced several years ago, shortly after which time the paternal grandmother filed her petition charging him with incorrigibility.
During the hearings held before the judge who made the original order, and before the judge who modified the order, the mother showed a disposition of total indifference to the welfare and happiness of her own flesh and blood. It seemed to the court that she had steeled her heart against her son. She gave every appearance of being a cold-blooded and heartless mother. The court had an opportunity of seeing and speaking to the minor, whom he no longer considered as a delinquent, but a fine, young lad who had reached the age when he was able to discern between right and wrong, and could appreciate the affection and love of the parents and grandparents; and that notwithstanding the fact that he did receive very fine treatment at the home of the foster parents with whom he had been *Page 235 
living, he was, nevertheless, most anxious to return to his mother and step-father, from whom he had been separated for more than ten years, and so pleaded with the court. Were it not for the fact that the court did not want to interrupt the young lad's schooling, and thereby probably retard him in his school work, the court would have made a final disposition of the matter at the last hearing; but, having heard testimony that the youngster would graduate from the grammar school in May of this year, and be ready to enter high school the next term, it felt that the boy ought to be permitted to stay where he is at present, and continue his schooling there, and after his schooling has been finished, have him attend the high school in the city of Philadelphia. The case was therefore continued until June, 1928, at which time the youngster shall have completed his grammar school education.
Attention is called to the fact that the presiding judge made appeal after appeal to the mother, to the step-father, and to the grandmother, to take the boy into their home and give him the affection to which he is entitled. The grandmother, after having the youngster with her over the holidays, agreed at the last hearing to take care of him half of the time if his mother would take him the other half, and so stated in open court. But the mother showed her defiance and lack of maternal instinct and affection by refusing to have anything at all to do with her own son. It was that attitude of the mother, coupled with the thought that the court at all times had in mind, the best interests and welfare of the child, that prompted the court to modify the order theretofore made.
Counsel for the appellant, Marie Schofield, in his notice to the court of the appeal taken, sets forth two reasons for so doing: (1) That Marie Schofield, the mother, was not a party to the record; (2) That the judge had no legal right to make an order upon the *Page 236 
mother of the child, it not having been shown that she had a separate income. Both of these contentions can be dismissed without much discussion.
It is our opinion that, as shown by its provisions, as well as by its preamble, the broad general purpose that the Legislature had in view when it enacted the Act of April 23, 1903, P.L. 274, known as the Juvenile Court Act, was to guard children from association and contact with crime and criminals, and to subject children lacking proper parental care or guardianship to a wise care, treatment and control, that their evil tendencies may be checked, and their better instincts may be strengthened, and to that end, to clearly distinguish the powers of the court in respect to the care, treatment and control over the classes of children mentioned from the powers exercised in the administration of the criminal law. The Act has been construed by our Appellate Courts in the case of Commonwealth v. Carnes,82 Pa. Super. 335 (1923), wherein GAWTHROP, J., said (page 338):
"The purpose of the Act of April 23, 1923, P.L. 274, is to prevent a trial and thus save children, under the age of sixteen years, from the ordeal of a trial if the child's own good and the best interests of the Commonwealth justify it."
And, in the case of Commonwealth v. Fisher, 213 Pa. 48, (1905), Mr. Justice BROWN, in referring to this Act, said:
"It is not for the punishment of offenders, but for the salvation of children, and points out the way by which the State undertakes to save, not particular children of a special class, but all children under a certain age, whose salvation may become the duty of the State in the absence of proper parental care or disregard of it by wayward children. No child under the age of sixteen years is excluded from its beneficent provisions." *Page 237 
In the same opinion the court further says:
"The Act is but an exercise by the State of its supreme power over the welfare of its children, a power under which it can take a child from its father, and let it go where it will, without committing it to any guardianship or any institution, if the welfare of the child, taking its age into consideration, can be thus best promoted. The true rule is: `That the courts are to judge upon the circumstances of the particular case, and to give their directions accordingly.' This was said in habeas corpus proceedings in Rex v. Sir Francis Blake Deleval et al., 3 Burr 1434, by Lord Mansfield, in discharging Anne Catley, a minor."
Attention is also directed to the language of Mr. Justice GIBSON in Ex Parte Crouse, 4 Wharton 9, (1839), where he speaks of parens patriae, or common guardian of the community:
"It is to be remembered that the public has a paramount interest in the virtue and knowledge of its members, and that, of strict right, the business of education belongs to it. That parents are ordinarily entrusted with it, is because it can seldom be put into better hands; but where they are incompetent or corrupt, what is there to prevent the public from withdrawing their facilities, held, as they obviously are, at its sufferance."
A careful review of the Acts relating to the care and treatment of juveniles since the enactment of the Juvenile Court Act of 1903, indicates that a judge presiding as a Juvenile Court judge has the right and the power to make an order for the support of a minor child upon either parent or both. For example, in section four of the Act of June 15, 1911, P.L. 959, which *Page 238 
amended section 4 of the Act of April 23, 1903, this language is used:
"And, in either case, it shall be within the power of the court to make an order upon the parent or parents of any such child to contribute to the support of the child such sum as the court may determine."
That same language appears in some of the subsequent acts. It is thus obvious that the court has the power to make an order upon the mother of a fatherless child (the mother, as appears from her own testimony, being able to work), without the necessity of showing that she has a separate independent income; it appearing that she has a husband who is able to support and provide for her, and with whom she is living and for whom she is keeping house.
In passing, it may be noted that the main contention of the mother and her husband, the step-father of the minor, was that they had no obligation to support this child, because of an agreement they had entered into with the paternal grandparents of the child many years ago, by the terms of which the paternal grandparents agreed to take care of and provide for the child. The court was of the opinion that that contention was not tenable, on the ground that it would be against public policy to enforce a contract of that kind; that the Commonwealth has an interest in the welfare of all children, and that the judge who presides acts for the Commonwealth and for the child or children who come before him. The court was of the opinion that no action of theirs could be binding upon the Commonwealth or any of its wards, the Commonwealth being parens patriae. As has been said in Com. of Penna. ex rel. Samuel S. Reckefus, by his mother and next friend, Irma K. Reckefus, appellant, v. Samuel S. Reckefus, decided on December 15, 1927, Superior Court of Pennsylvania, No. 232, October T., 1927, by KELLER, J.: *Page 239 
"Irrespective of the legality, as between themselves, of the agreement entered into between this mother and her then husband, she could not by such action tie her child's hands or prevent him from having recourse to the remedies against his father which the law afforded to one in his situation; nor relieve the father of his parental obligations to the boy: Henkel's Estate, 13 Pa. Super. 337,343, and other cases cited."
As to the question of whether Marie Schofield was a party to the record, suffice it to say that she was present at every hearing that was held in this matter, antagonistic at all times to an order being made upon her; had opportunity to be heard; appearing with counsel and was heard, and had an opportunity to examine or cross-examine her own son. It would be rash to say that she, the mother, was not a party in interest, because no one could or should have a greater interest in a boy than his own mother.
In conclusion, the presiding judge was ever mindful of the fact that it is the duty of the court to determine, in the light of the facts established by the evidence, what order the child's own good and the best interests of the State may require; and the Court was of the opinion that the best interests of the State required that the mother be made to realize her maternal obligations to her son. The court, therefore, modified the order.
The court made the following order:
And Now, January 4, 1928, after due consideration of the testimony heard in open court the order heretofore made is modified and Fred Stees is committed to the Children's Aid Society for private placement and an order for his support and maintenance is made on the County in the sum of four dollars and twenty-five cents a week in favor of the C.A.S., and it is further ordered that the grandfather, Louis Stees, reimburse the County in the sum of two dollars and fifty cents, *Page 240 
and that the mother, Marie Schofield, reimburse the County in the sum of one dollar and seventy-five cents and pay seventy-five cents directly to C.A.S., and that the paternal grandmother, Maude Stees, pay the sum of one dollar direct to C.A.S., for support and maintenance of said Fred Stees.
Marie Schofield appealed.
Error assigned was the order of the court.